UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVIE L. JONES, JR.,

      Plaintiff,

v.

      Case No. 1:15-cv-1212

CHAD WILLIAMS, et al.,

      Hon. Hala Y. Jarbou

      Defendants.

_____/

## OPINION

This is a civil rights action under 42 U.S.C. § 1983. Plaintiff Davie L. Jones, Jr., is a prisoner proceeding pro se. Defendants Chad Williams, Gary Collins, Michael Schafer, and William Andersen are officers employed by the Michigan Department of Corrections (MDOC). On April 5, 2021, the Court held a bench trial on Plaintiff's claims against Defendants. This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I. CLAIMS

Plaintiff claims that Defendants retaliated against him in violation of the First Amendment or conspired to do so. To prevail on his retaliation claims, Plaintiff must prove by a preponderance of the evidence that: (1) he engaged in conduct protected by the First Amendment; (2) a defendant took an adverse action against him that would deter a prisoner of ordinary firmness from engaging in that protected conduct; and (3) the adverse action was motivated, at least in part, by Plaintiff's protected conduct. *Thaddeus–X v. Blatter*, 175 F.3d 378, 388-99 (6th Cir. 1999) (en banc); *Parker v. Reddin*, No. 20-1106, 2020 WL 8415084, at *5 (6th Cir. Aug. 5, 2020); *King v. Zamiara*, 150

F. App'x 485, 491 (6th Cir. 2005).  A prisoner's non-frivolous grievances and complaints, whether oral or in writing, are protected conduct.  *Maben v. Thelen*, 887 F.3d 252, 265 (6th Cir. 2018).

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action."  *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)).  To the extent Plaintiff contends that two or more defendants conspired to retaliate against him, he must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff.  *Hensley*, 693 F.3d at 695; *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011).

## II. FINDINGS AND CONCLUSIONS

### A. Confiscation of Plaintiff's Property

In November 2014, Jones was incarcerated at the Carson City Correctional Facility (DRF) at Level I security.  On November 5, 2014, prison officials increased his security level from level I to level IV due to a conviction for a prison misconduct.  According to MDOC policy, prisoners housed in level IV security are not permitted to keep the same type and quantity of personal property as prisoners housed in level I.  (*See* MDOC Policy Directive 04.07.112 (Dec. 12, 2013), Pl.'s Ex. 4.)  For instance, prisoners in level I cannot keep property that exceeds what can be contained in a state-issued duffel bag *and* a footlocker, whereas prisoners in level IV cannot keep property that exceeds what can be contained in a duffel bag *or* a footlocker.  Property exceeding these limits is considered contraband.

Because of the increase in his security level, prison officials withheld Plaintiff's personal property.  Plaintiff kited Defendants Williams and Collins about that property several times and

received no response.[1]  Finally, on December 9, 2014, he filed a grievance against Williams for failing to make Plaintiff's property available to him.  (*See* Grievance No. DRF14120265519Z, Defs.' Ex. F.)

At trial, Defendant Collins testified, and prison records confirm, that Collins met with Plaintiff about his grievance on December 11, 2014.  Collins gave Plaintiff an opportunity to pack his personal belongings into a state-issued duffel bag, in accordance with the limit set forth in prison policy.  Plaintiff did so.  Plaintiff agreed to release most of the items that did not fit in the bag to his partner, Sheila Shane, who later picked them up from the facility during a prison visit.  Plaintiff agreed to discard the remaining items.  Collins prepared a hearing report detailing the disposition of Plaintiff's property.  (Admin. Hr'g Rep., Defs.' Ex. D.)  In addition, Plaintiff signed a property release form identifying Sheila Shane as the designated recipient of his excess personal property.  (Property Release Form, Defs.' Ex. E.)

Plaintiff alleged in his complaint, and testified at trial, that Collins refused to give Plaintiff any of his personal property, and when Plaintiff threatened to file a grievance about his right to a "contraband hearing" and to an "itemized property receipt," Collins demanded that Plaintiff leave.  (*See* Compl., ECF No. 1, PageID.5.)  In other words, Collins allegedly retaliated against Plaintiff in response to Plaintiff's complaints and Plaintiff's threat to file a grievance by confiscating Plaintiff's personal property and refusing to hold a hearing to consider Plaintiff's preferences regarding the disposition of his property.  The preponderance of the evidence presented at trial does not support these assertions.  Rather, the evidence discussed above shows that Collins gave Plaintiff an opportunity to pack his personal belongings into a state-issued container, in accordance

---

[1] Plaintiff has repeatedly asserted—in his complaint, in an affidavit, and at trial—that he spoke with Williams about his property on November 7, 2014, but the MDOC's records show that Williams was not at the facility that day.  (*See* Timesheet, Defs.' Ex. H.)

with prison policy. Plaintiff could not keep the remaining property due to his security level, so Plaintiff agreed to release most of it to his partner and discard the rest.

Plaintiff also claims that Collins conspired to fabricate and falsify documents, ostensibly in retaliation for Plaintiff's protected conduct of filing grievances or threatening to do so. For instance, Plaintiff contends that the hearing report prepared by Collins falsely states that Plaintiff received notice of the hearing on December 11, 2014. However, Collins testified at trial that he held the hearing with Plaintiff on December 11 in response to Plaintiff's grievance claiming that he had not received a hearing. In other words, Plaintiff received notice of the hearing on the same day as the hearing itself, which is consistent with the hearing report.

Plaintiff also contends that he did not agree to dispose of his property in the manner discussed in the hearing report, but the evidence refutes this assertion. His signature appears on the property release form. Plaintiff argues that this form is a forgery, but Plaintiff's signature on this form is similar in appearance to Plaintiff's signature on other documents that he prepared and signed, such as his grievances. (*See, e.g.*, Grievance No. DRF14120265519Z, Defs.' Ex. F.) Moreover, it is unlikely that Defendants would manufacture a form identifying Plaintiff's partner as the designated recipient of Plaintiff's property. Plaintiff does not explain how Defendants would have acquired information about his partner in order to fabricate that form. Furthermore, on December 11, 2014, Plaintiff signed the response to his grievance about the confiscation of his property, affirming that the grievance "has been resolved." (*Id.*) That signature indicates that Plaintiff was initially satisfied with the disposition of his property at the end of his meeting with Collins.

Plaintiff did file a grievance *after* this meeting with Collins, in which he claimed that Collins should have allowed Plaintiff to keep his property at the facility while Plaintiff was

4

grieving his administrative remedies regarding his placement in security level IV.  (*See* Grievance No. DRF14120266219Z, Pl.'s Ex. 3.)  That grievance undermines Plaintiff's credibility because, contrary to his testimony at trial, it expressly acknowledges that Collins held a hearing about Plaintiff's personal property.[2]

Furthermore, at trial, Plaintiff failed to show that prison policy required Collins to keep Plaintiff's personal property at the facility while Plaintiff exhausted his remedies as to his security level placement.  Indeed, the prison policy referenced by Plaintiff states that the prison will keep a prisoner's excess property at the facility for 30 days if the prisoner is placed in security level IV or V *and that level is not the prisoner's "true" security level.*  (MDOC Policy Directive 04.07.112, Pl.'s Ex. 4.)  In Plaintiff's case, level IV was his true security level; thus, the 30-day provision did not apply to him.  Accordingly, the preponderance of the evidence establishes the following: (1) Defendants were not obligated to keep Plaintiff's property at the prison facility for 30 days; (2) Collins gave Plaintiff the hearing to which he was entitled under prison policy; and (3) Plaintiff himself agreed to the disposition of his personal property.

In short, Plaintiff failed to show by a preponderance of the evidence that Collins or Williams fabricated or falsified documents.  In addition, Plaintiff failed to show that these Defendants retaliated in any way against Plaintiff or otherwise violated his constitutional rights in connection with the confiscation and disposition of his personal property.

### B. Threat by Williams about Plaintiff's Complaints

Plaintiff contends that, in January 2015, he prepared civil service complaints claiming that Collins and Williams had falsified and/or forged the documents described above.  On January 16,

---

[2] Plaintiff points to a response to one of his grievance appeals, in which Assistant Deputy Warden Fenby asserted that "[t]here was no hearing held" regarding Plaintiff's property.  (*See* Step II Grievance Appeal Response, Pl.'s Ex. 9.)  That statement, however, is hearsay and lacks foundation.  Moreover, it conflicts with Plaintiff's express assertion in his grievance that he received a hearing.

he went to Defendant Williams's office to mail these complaints to the MDOC director's office as expedited legal mail. At the time, Williams was an Assistant Resident Unit Supervisor at DRF. One of his duties was handling prisoner legal mail.  According to Plaintiff, Williams looked at Plaintiff's documents and stated that Plaintiff would regret filing grievances and complaints against him.

However, Williams testified that prisoners regularly came to his office to send legal mail, as often as ten to fifteen times per day.  Much of this mail involved complaints about the MDOC. Typically, the envelopes containing this mail would be sealed when prisoners presented them to Williams for mailing as expedited legal mail.  The prisoner would complete an expedited legal mail form identifying the recipient of the mail and attach that form to the mail envelope.  Williams would sign this form and then turn the mail over to the mail room.  Williams would have no reason to look at the contents of the mail if the form indicated that the mail was addressed to a court, an attorney, or a central office at the MDOC, like the director's office.  Prison policy stated that prison staff "may" require prisoners to present their expedited mail in an unsealed envelope so that staff could verify that it qualified for expedited handling (MDOC Policy Directive 05.03.118, Defs.' Ex. L), but Williams did not require prisoners to do so.  In Plaintiff's case, the expedited mail form indicated that Plaintiff was sending his mail to the civil service commission at the director's office. (Disbursement Authorization, Pl.'s Ex. 13.)  Thus, Williams had no reason to look at the contents of Plaintiff's documents to determine whether they qualified for handling as expedited legal mail.

Furthermore, even if Williams did read Plaintiff's documents, there is no evidence that Williams would have had any reason to threaten Plaintiff for sending them.  Prisoner complaints about MDOC staff are a common occurrence, and Plaintiff's particular complaint about forgery by Williams was far-fetched and implausible.  In short, the preponderance of the evidence does

6

not support Plaintiff's claim that Williams looked at his mail and then threatened him about filing grievances and complaints.  Thus, Plaintiff failed to show that Williams retaliated against Plaintiff for exercising his First Amendment rights.

### C.  Statements and Cell Search by Schafer

Plaintiff testified that, the same day that Williams said Plaintiff would regret filing grievances against him, Officer Schafer made the same statement to Plaintiff, "almost verbatim." Schafer then escorted Plaintiff and his cellmate out of the cell to another room and conducted a "shakedown," or search, of Plaintiff's cell, destroying Plaintiff's typewriter by throwing it on the floor.

During the search, Schafer discovered a weapon (i.e., a razor blade attached to a pen tube) concealed inside a hole in Plaintiff's mattress.  Schafer charged Plaintiff with possession of a weapon, a major misconduct.  A hearing officer found Plaintiff guilty of the misconduct on January 27, 2015, and then punished him with confinement in segregation.  Plaintiff claims that Schafer searched his cell, destroyed his property, and planted the weapon in retaliation for Plaintiff's protected conduct.

Officer Schafer testified that when he worked in Plaintiff's housing unit, he had to search three prisoner living areas per day.  The areas were selected at random.  Other officers did the same, so over the course of three days in January 2015 (around the time that Schafer searched Plaintiff's cell), a total of 45 prisoners in Plaintiff's building (including Plaintiff) had their living areas searched.  No evidence indicates that the decision to search Plaintiff's cell was anything other than random and routine.

Schafer denied making any comments to Plaintiff about his grievances.  Indeed, it is unlikely that he would have made almost the exact same statement that another officer had made to Plaintiff at another time.  Furthermore, it is unlikely that Schafer would have been aware of

complaints and grievances that Plaintiff had filed against other officers.  Apart from Plaintiff's testimony about what Schafer said to him, there is no evidence that Schafer was aware of those grievances, let alone that Schafer would have had reason to retaliate against Plaintiff for filing them.

Furthermore, the preponderance of the evidence does not support Plaintiff's contention that Schafer destroyed some of his property.  Plaintiff testified that the entire cell was "destroyed" as a result of the search; his typewriter was thrown on the floor, some of his property ended up on his cellmate's bunk, and some of his cellmate's property ended up on Plaintiff's bunk.  However, Schafer testified that he left Plaintiff's cell in a condition close to the way it was when he entered it.  Plaintiff's cellmate at the time of the search, Aquire Simmons, generally confirmed Schafer's account.  Simmons testified that he recalled seeing "stuff" on Plaintiff's bunk and that Plaintiff's bed sheet was "messed up," but that, contrary to Plaintiff's testimony, Simmons's area of the cell had not been "bothered."  Simmons did not mention seeing a destroyed typewriter or any belongings on the floor.  Viewing the evidence as a whole, Plaintiff's account is not credible.

Similarly, the preponderance of the evidence does not support Plaintiff's contention that Schafer planted a weapon in his cell.  Plaintiff attempted to discredit Schafer's testimony about finding the weapon in Plaintiff's cell by indicating that, during Schafer's investigation, Schafer took a photograph of the weapon but did not take a photograph of the hole in Plaintiff's mattress. However, Schafer explained that the weapon was his concern, not the mattress.  Moreover, according to Schafer, it was not unusual for prisoner mattresses to have holes in them, so it was not important to document that Plaintiff's did as well.  Thus, Schafer's failure to document the condition of Plaintiff's mattress at the time he discovered the weapon in Plaintiff's cell does not discredit his testimony.

Plaintiff also attempted to show that his mattress did not have a hole in it through the testimony of Simmons.  Simmons stated that, sometime before Plaintiff transferred to their cell, Simmons inspected and cleaned the whole cell and did not notice a hole in the mattress later used by Plaintiff.  However, Simmons also testified that, after he performed this cleaning and inspection, three other inmates stayed in the cell with Simmons before Plaintiff arrived.  Consequently, Plaintiff or one of those other inmates could have created the hole after Simmons's inspection.  Simmons did not testify about the condition of Plaintiff's mattress at the time of the cell search.  Thus, Simmons's testimony provides little support for Plaintiff's assertion that no hole existed when Schafer searched Plaintiff's cell.

In short, Plaintiff failed to prove by a preponderance of the evidence that Schafer (1) made statements about Plaintiff's grievances, (2) destroyed Plaintiff's property, or (3) searched and planted a weapon in Plaintiff's cell in retaliation for Plaintiff's protected conduct.  Thus, Plaintiff failed to prove his retaliation claims against Schafer.

In addition, as Defendants note, Plaintiff's retaliation claim concerning the allegedly planted weapon is barred by the outcome of his major misconduct proceedings.  A prisoner's § 1983 claim premised on a false accusation of a major misconduct may be barred where there has been a finding of guilt in the misconduct proceedings.  *See Peterson v. Johnson*, 714 F.3d 905, 917 (6th Cir. 2013).  As the Sixth Circuit has clarified:

> To determine whether we must give preclusive effect to "factfinding from Michigan prison hearings," we look to four requirements, all of which must be met: (1) the state agency "act[ed] in a 'judicial capacity'"; (2) the hearing officer "resolved a disputed issue of fact that was properly before it"; (3) the prisoner "had an adequate opportunity to litigate the factual dispute"; and, (4) if these other three requirements are met, we must "give the agency's finding of fact the same preclusive effect it would be given in state courts."  *Peterson v. Johnson*, 714 F.3d 905, 911-13 (6th Cir. 2013) (internal citation and quotation marks omitted).

*Maben*, 887 F.3d at 259.

> [T]he question of preclusion cannot be resolved categorically, as it turns on case-specific factual questions such as what issues were actually litigated and decided, and whether the party to be precluded had sufficient incentives to litigate those issues and a full and fair opportunity to do so—not just in theory, but in practice. It likewise turns on the court's sense of justice and equity, which may require a case-by-case analysis of surrounding circumstances.

*Roberson v. Torres*, 770 F.3d 398, 404-05 (6th Cir. 2014) (citations and quotation marks omitted).

Here, the misconduct hearing report indicates that a hearing officer, acting in a judicial capacity, specifically considered and rejected Plaintiff's assertions that there was no hole in his mattress and that Officer Schafer "set up" Plaintiff by placing a weapon in his cell, satisfying the first two requirements of preclusion. (*See* Class I Misconduct Hr'g Rep., Defs.' Ex. N.) Among other things, the hearing officer noted that another officer confirmed the existence of the hole in the mattress. (*Id.*) Also, the hearing officer considered a statement from plaintiff and questions posed to prisoner Simmons,[3] satisfying the third requirement of preclusion. (*Id.*) Plaintiff argued to the hearing officer that Schafer set him up because Plaintiff had problems with Collins and Williams, but like this Court, the hearing officer did not find it "likely or logical" that Schafer would enter into a conspiracy with these other officers to plant a weapon in Plaintiff's cell. (*Id.*) Thus, preclusion applies to the facts found by the hearing officer, barring Plaintiff's claim that Schafer retaliated against him by planting the weapon.

**D. Prison Transfer**

After the misconduct conviction, Plaintiff filed a grievance claiming that Schafer had retaliated against him by charging him with a misconduct. On February 3, 2015, while Plaintiff was in punitive segregation, the Security Classification Committee (SCC) met with him to determine his security level. Defendant Andersen was part of the committee at that time. Plaintiff

---

[3] At trial before this Court, Simmons confirmed that he gave a statement to the hearing investigator.

says that he told the committee that, if he moved back to the general population, he feared retaliation from Collins, Williams, and Schafer. However, the SCC determined that Plaintiff could be moved back to the general population. (*See* Security Reclassification Notice, Defs.' Ex. P.)

A few days later, Plaintiff says that Andersen walked through Plaintiff's unit and asked Plaintiff if he would be returning back to the general population. Plaintiff contends that he responded by asking Andersen whether Schafer, Collins, and Williams were being investigated for the complaints Plaintiff had filed against them. According to Plaintiff, Andersen told him that, if Plaintiff had not filed his grievances and complaints, he would have nothing to worry about.

On February 10, 2015, Andersen prepared a security classification screen to determine Plaintiff's security level. (*See* Security Classification Screen – Review, Defs.' Ex. Q.)

On February 12, 2015, Plaintiff filed a grievance on the SCC for allegedly failing to consider Plaintiff's fear of retaliation and on Andersen for his statements about Plaintiff's grievances and complaints.

According to Plaintiff, Andersen came to his cell again on February 16 to "confront" Plaintiff about the grievance that Plaintiff had filed on Andersen. Plaintiff testified that Andersen told Plaintiff that his "ticket had been punched for a transfer up north," so that Plaintiff would never be able to file a grievance or complaint again. Plaintiff was transferred to Chippewa Correctional Facility on February 19, 2015. He claims that Andersen initiated this transfer in retaliation for Plaintiff's complaints and grievances.

The evidence indicates otherwise. On February 6, Plaintiff was charged with a misconduct for disobeying a direct order. He refused to leave his segregation cell to be moved back to the general population. (Misconduct Rep., Defs.' Ex. V.) A hearing officer found him guilty of this misconduct on February 12. (Class I Misconduct Hr'g Rep., Defs.' Ex. V.) Deputy Krick signed

11

a transfer order on February 18 because Plaintiff refused to be housed in the general population at DRF. (*See* Transfer Order, Defs.' Ex. M.) An official in the MDOC's central office approved the order. (*Id.*)

Defendant Andersen testified that he had no role in the transfer. No evidence indicates that Defendant Andersen was involved in the decision to transfer Plaintiff, let alone that the transfer decision was motivated by Plaintiff's protected conduct. Plaintiff apparently relies on the security screen prepared by Andersen on February 10, but Andersen completed this screen *before* Plaintiff filed his grievance on Andersen. And in any case, Plaintiff did not show that the security screen initiated his transfer.

Also, Plaintiff himself testified that he refused to return to the general population at DRF and that he wanted to be transferred to another facility. Thus, not only does the preponderance of the evidence negate Andersen's involvement in the transfer, it also provides a reasonable, non-retaliatory reason for the transfer. Thus, the evidence does not support Plaintiff's retaliation claim concerning the transfer.

### III. CONCLUSION

In short, the Court finds in favor of Defendants Williams, Collins, Schafer, and Andersen. Plaintiff failed to prove his constitutional claims against them by a preponderance of the evidence.

A judgment will enter consistent with this Opinion.

Dated:  June 9, 2021                                    /s/ Hala Y. Jarbou
                                                       HALA Y. JARBOU
                                                       UNITED STATES DISTRICT JUDGE